## LUKMANIS v. UNITED STATES.

United States District Court
S. D. New York.

June 16, 1952.

Harry Eisenberg, New York City, Jacob Rassner, New York City, of counsel, for libelant.

Myles J. Lane, U. S. Atty., New York City, Haight, Deming, Gardner, Poor & Havens, New York City, James M. Estabrook and J. Ward O'Neill, New York City, of counsel, for respondent.

McGOHEY, District Judge.

The libelant sues for damages resulting from injuries sustained in the performance of his duties as a seaman in the respondent's employ aboard the S. S. Marine Carp on July 8, 1947.

Libelant testified he had no recollection of the accident. He remembered only being ordered to his life boat station during Coast Guard inspection, getting his life jacket and going on deck. The next thing he recalled was being in Roosevelt Hospital, New York, several days later. The medical records show that he was removed from the vessel to the hospital on July 8, and that he sustained fracture of the skull and of two fingers of his left hand. No eyewitness to the accident was called. By agreement of counsel, there were received in evidence on libelant's case the reports of the Master and Chief Officer. The Master stated:

"On the morning of July 8th, 1947. The starboard lifeboats were being lowered at the request of Captain Christiansen United States Coast Guard, in order to test the limit switches. At 11:55 A. M. the ship's deck crew had proceeded to No. #5 & 5-A. lifeboat, in order to clear same and have ready for lowering. The forward gripe was free, but the after gripe was still secured. In order to release the strain on the after gripe the cra[n]k to the motor was placed on the shaft. As soon as the crank was in position the motor started spining, turning the crank. The cause of this accident is unknown at the present time

"The following is a list of injured crew members and the extent of their injuries:

"1. Garner, Fred (A.B.) Compound fracture of right leg and laceration of elbow.

"2. Luckmanis, Zanis (A.B.) Basal skull fracture—deep laceration of left palm.

"3. Elmadah, Mohamed (A.B.) Sprained right wrist."

The Chief Officer stated in part:

"This is to inform you, that there was an accident aboard this vessel July 8th, 1947, approximate time 11:00 A. M., while preparing to test #5 life boat in presence of Mr. Christensen, U.S.C.G. Marine Inspector. The after gripe was fast, in order to free gripe, the crank was placed in proper position to bring boat up by hand to relieve weight of boat on after gripe. Three men were ordered by the boatswain to commence cranking boat up, there was no one at the electrical switch, the limit switches were in an off position, suddenly the current came on and spun the crank, injuring the following three A.B., Zanis A. Lukmanis, Fred. Garner and Mohamed Elmadah, two of the men being seriously injured.

"Medical aid was given by the Ship's Medical Staff, during the first aid procedure an amblance was called, and the men removed to Roosevelt Hospital. One A.B. Mohamed Elmadah, returned to the ship after a complete check up, and returned to work, the Doctor finding this man fit for duty. * * *"

These accounts were not contradicted, questioned or modified. They compel me to infer either that someone turned on the electric current while the men were manually turning the crank on the motor's shaft, or that the equipment was in such a defective condition that the current came on without the switch being thrown. Either inference would establish respondent's liability which indeed was not disputed, although it was not formally conceded. The real contest was on the extent of the injuries and the amount of damages.

The libelant was treated at Roosevelt Hospital from July 8 to July 23, 1947, when he was transferred to the Marine Hospital at Stapleton, Staten Island, where he remained until August 26, 1947. He was discharged on that date in a condition described as "improved" and his prognosis was "good." He was declared "not fit for duty," however, and was directed to

return for physiotherapy and further observation. He did so and received physiotherapy treatments three times a week until September 15. He was then told to rest "at home for one month before returning to work." On November 12, he went to work as a seaman aboard the S. S. Harmon T. Ricketts and served until December 23, 1947. Between that date and January 23, 1948, he received some treatments an an out-patient at the Hudson and Jay Streets clinic of the Marine Hospital. From January 23, 1948, to July 12, 1951, he received no medical treatment of any kind except for an injury to his thumb concededly not caused by this accident. On the latter date he went to the Hudson and Jay Streets clinic for treatment of a tubercular condition which likewise is conceded to be unrelated to this accident. Thus, from January 23, 1948, to the date of trial he has sought no treatment for any condition resulting from this accident. He claims that during the interval of approximately forty months, from January 23, 1948, to July 12, 1951, he suffered constantly from headaches and recurring periods of fatigue which he says required him to rest at home. During that interval, however, according to his own testimony he worked as an able-bodied seaman for fifteen months, and as a carpenter on a building project on Long Island for not less than six months. During another month he traveled to Canada and back. The remaining eighteen months, he says, were made up of several rest periods ranging from one week to several months between jobs. These rest periods, he claims, were necessitated solely by his physical condition resulting from the accident. I do not believe they were.

Before signing on with the United Fruit Company on February 18, 1948, he was examined and found fit for duty. A master under whom he served on several voyages after that date testified that libelant did his work so well he was given and accepted every opportunity to work overtime. I believe that testimony. Libelant neither asked for nor received any medical treatment at sea except on one or two widely separated occasions when, for a headache complaint, he was given phenacetin. I can find no causal relation between this accident and his layoffs between voyages. To begin with, libelant neither sought nor received any medical treatment after February 18, 1948 for the fatigue which he says required him to rest at home. Moreover, his counsel conceded that during 1948 and 1949, at least, there was a substantial drop in seamen's employment. It was also conceded that the Maritime Union gave a citizen preference in employment over an alien, which libelant was up to March, 1951. His own medical expert testified that in his opinion "from an orthopedic" standpoint the libelant was fit for duty as a seaman, and that he could not say that the alleged layoffs were due to the accident. He said that question required a neurological evaluation which he, as an orthopedist, was not competent to make. No neurologist was called by libelant.

Libelant further claimed that his sight, hearing, taste and sense of smell were seriously impaired. He showed every evidence of normal hearing while on the witness stand. He did not wear eyeglasses. I do not accept his testimony as to impairment of these senses. While he had a serious injury, he has also had a complete recovery, as evidenced by his work record and medical history since the accident. Since he returned to sea in February, 1948, he has not sought or received treatment of any kind for any condition related to the injuries sustained in this accident. His present disability, if any, appears to be due to a tubercular condition which, as stated above, is in no way related to this accident.

■ Accordingly, he is awarded $4,000 general damages. He is also entitled to lost wages of $180 per month from July 8, 1947, to November 12, 1947, when he first returned to work, and also for the period from December 23, 1947, to February 18, 1948, during which he received treatment as an out-patient at the Hudson and Jay Streets clinic. This comes roughly to six months. It was stipulated that before the accident he earned overtime averaging $50 per month. There is no

evidence that this accident has caused him to lose any opportunity for advancement in rank or earning capacity. The award for lost wages, therefore, will be $1,380. It was stipulated also that he is entitled to maintenance for a total of 135 days. This will be at the rate of $6 per day, and amounts to $810.

Submit findings and conclusions in accordance herewith.